UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Shawnathan Delrea Fort, | Case No. 3:24-cv-1644 |
| Plaintiff, | |
| v. | MEMORANDUM OPINION<br>AND ORDER |
| Delaney Weirich, et al., | |
| Defendants. | |

## I.  INTRODUCTION

Defendants Delaney Weirich and Ciara Buck have moved for summary judgment on *pro se* Plaintiff Shawnathan Delrea Fort's § 1983 First, Eighth, and Fourteenth Amendment claims.  (Doc. No. 13).  Fort failed to file a brief in opposition.  For the reasons stated below, I grant Defendants' motion.

## II.  BACKGROUND

Fort is currently incarcerated at the Toledo Ohio Correctional Institution ("ToCI") following convictions for phone harassment, menacing by stalking, and the violation of a protective order.  (Doc. 13-1 at 2, 287).  During 2023 and 2024, Fort was housed in ToCI's Transitional Programing Unit ("TPU").  (*Id.* at 2).  Weirich was employed by the Ohio Department of Rehabilitation and Correction ("ODRC") and served as Fort's case manager while he was housed in the TPU.  (*Id.*).  Buck served as a Sergeant in the TPU and was responsible for, among other duties, providing general supervision, coordinating activities, resolving inmate disputes, and investigating complaints.  (*Id.* at 6).

The ODRC, like most correctional systems, provides protective control ("PC") when there are signs that an inmate's safety may be at risk, requiring separation from the general population. (*Id.* at 277-78).  To qualify for PC, "the perceived threat must be greater than a normal threat as associated with being incarcerated, the threat must be specific and persistent, statewide, and verifiable." (*Id.* at 279).  Either a staff member or an inmate can initiate a PC request.  (*Id.*).  Upon receipt of a request or referral, the Protective Control Committee – consisting of two members appointed by the managing officer – investigates the claim.  (*Id.*).  Following the investigation and a hearing, the committee can recommend PC placement, unit separation, institutional transfer, interstate compact placement, or deny the request.  (*Id.* at 278-79).

In the fall of 2023, Fort filed a request for PC placement.  (*Id.* at 2-3).  He alleged that he had borrowed money from his crime victim and claimed that she and her mother were now engaging in "RICO" activities by soliciting individuals inside the prison to assault him.  (*Id.* at 158, 287).  Fort also claimed that his victim was engaging in "economic espionage" by forcing his family members to bring drugs into ToCI for Fort to sell.  (*Id.* at 169, 287).

Weirich served as a member of the Protective Control Committee.  (*Id.*).  She personally investigated the allegations underlying Fort's PC request.  (*Id.* at 2).  After reviewing Fort's prior PC requests and speaking with ToCI's security threat group coordinator regarding Fort's previous alleged assaults and threats, Weirich could not identify any corroborating evidence to support Fort's claims.  (*Id.* at 2).  The security threat group coordinator likewise reported that he could not substantiate any of Fort's allegations.  (*Id.*).  The committee ultimately concluded Fort's allegations were without merit and unsubstantiated.  (*Id.* at 287).

Weirich explained to Fort that to qualify for PC, the perceived threat must be statewide, persistent, specific, and verifiable – standards that Fort's allegations did not satisfy.  (*Id.* at 3).  Weirich also relayed that Fort's mental health status was not grounds for PC placement.  (*Id.*).  Fort

filed a second PC request based on the same allegations.  (*Id.* at 285).  After finding no evidence to support his claims, that request was also denied.  (*Id.*).

Throughout the PC investigation process, and for some time after, Weirich engaged in conversations and correspondence with Fort and became concerned about his mental health.  (*Id.* at 3).  She found some of his allegations to be "very delusional and improbable."  (*Id.*).  Buck also acknowledged that Fort's thoughts were "irrational and unorganized."  (*Id.* at 6).  For example, Fort informed Weirich that the victims of his crimes had "rigged the scoreboard" during a 2012 softball game, leading to his dismissal from school and initial incarceration.  (*Id.* at 190).  He formed this belief because the final score of the game was seven to twenty-five, his victim's jersey number was seven, and Fort's own high school jersey number was twenty-five.  (*Id.*).  Fort was convinced that his victim and her family had stolen his property, confiscated his Covid-19 relief check, and had enticed him into violating a protective order so he would incur further charges.  (*Id.* at 178).  He would later share that he believed over one billion people in China had read a novel he allegedly authored, creating a "subliminal [i]nfluence that caused the [Covid] 19 virus."  (*Id.* at 201).

Recognizing that something was "off" about Fort, Weirich contacted the Mental Health Department "concerning Fort's mental health needs and stability."  (*Id.* at 3).  The Mental Health staff placed Fort on the "lower level" of the mental health caseload.  (*Id.*)  While Fort was housed in the TPU, Mental Health staff conducted weekly rounds and provided inmates with workbooks, puzzles, crayons, and other therapeutic supplies.  (*Id.* at 7).  The TPU maintained open office hours on Mondays and Thursdays, and inmates were able to request Mental Health Department services either by phone or through a holistic services request.  (*Id.*).  Fort was ultimately prescribed Duloxetine.  (*Id.* at 164).

Fort is a frequent litigant and has filed multiple actions against various parties, including a prior claim against Weirich.  (*See Fort v. Weirich*, No. 23-cv-136).  On March 25, 2024, Fort and

3

Weirich reached an agreement resolving the prior claim against her, and on July 29, 2024, Fort voluntarily dismissed that action.  (*Id.* at Doc. No. 19, 22).  On June 25, 2024 – three months after the parties agreed to resolve the prior dispute – ToCI's Special Response Team ("SRT") extracted Fort from his cell, conducted a search, and confiscated approximately 800 pages of a young adult science fiction novel and 200 songs written by Fort.  (Doc. No. 13-1 at 4, 114).  At the time of the search and seizure, Fort was no longer housed in Weirich's unit.  (*Id.* at 4).

Over the following months, Fort filed multiple grievance reports and sent several kites to Weirich and Buck requesting the return of his novel and songs.  (*Id.* at 4, 44, 50, 52, 63, 114, 252, 260).  Fort asserted that the confiscated materials were "legal work" and were part of his "Mental Health Cognitive Behavior[al] Therapy."  (*Id.* at 50).  Buck eventually inquired with the Mental Health Department concerning Fort's alleged cognitive behavioral therapy.  (*Id.* at 51).  The Mental Health Department informed Buck that Fort "was not enrolled in that program."  (*Id.*).

On July 12, 2024, Fort sent Weirich a kite requesting that she fill out a "theft/loss report" concerning the missing items.  (*Id.* at 114).  Because Fort was no longer housed in Weirich's unit, she instructed Fort to contact his new case manager and directed him to reach out to Buck concerning the filing of a report.  (*Id.* at 115).  Fort did so on August 8, 2024, informing Buck that the SRT had "misplaced" his property.  (*Id.* at 54).  He requested that Buck check the vault to determine whether the items were stored there.  (*Id.*).  Buck responded that "there was nothing taken" and that the staff did not have any property bearing Fort's name but stated that she would look in the vault.  (*Id.* at 55).  As of the filing of Fort's Complaint, the novel and songs had not been returned.

Fort alleges Weirich and Buck have violated his rights under the First, Eighth, and Fourteenth Amendments.  (Doc. No. 1 at 5).  He seeks $80,000,000 in damages for the loss of his alleged legal materials, an injunction requiring ToCI to place him in a single-occupancy cell within

4

the PC unit, and a temporary restraining order prohibiting SRT from conducting cell extractions and searches.  (*Id.*).

### III.    STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant and all reasonable inferences are drawn in the nonmovant's favor.  *See, e.g.*, *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015) (citing cases).  A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law.  *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.    ANALYSIS

Fort asserts Weirich and Buck violated his constitutional rights and seeks, among other things, monetary relief.  Fort must rely on civil rights statutes to seek damages, as the Constitution itself does not provide for a direct cause of action.  I will interpret Fort's constitutional allegations as being brought under 42 U.S.C. § 1983, as no other statute provides a plausible basis for relief.  *See Snell v. Vill. of Bellville*, No. 1:11 CV 1744, 2011 WL 5361120, at *3 (N.D. Ohio Oct. 28, 2011).

To establish a claim under § 1983, Fort must prove that (1) he was deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was caused by a person acting under color of state law.  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Defendants contend that Fort cannot prove that Weirich and Buck violated his constitutional rights, and thus they are entitled to judgment as a matter of law.  (Doc. No. 13 at 6).

**A.     EIGHTH AMENDMENT VIOLATIONS**

Fort states that prison officials "have a duty to provide appropriate mental health care as mandated by the Eighth Amendment." (Doc. No. 1 at 7).  He alleges Buck violated this duty by refusing to conduct a theft/loss report and thereby failing to "assist [Fort] in acquiring his mental health cognitive behavior[al] therapy." (*Id.*).  Fort maintains that without this therapy, he will suffer "unnecessary and wanton psychological and physical pain," making his pending seven years in restrictive housing a violation of the Eighth Amendment.  (*Id.* at 7, 9).

Defendants contend that Fort's mental illness is not a "sufficiently serious" medical need. (Doc. No. 13 at 8).  They also argue that because Weirich and Buck responded reasonably to Fort's needs, Fort cannot establish the Defendants acted with deliberate indifference.  (*Id.* at 9).

First, it is not a foregone conclusion that Fort will indeed spend the remainder of his sentence in Restrictive Housing.  Fort was previously housed in Extended Restrictive Housing and Restrictive Housing ("ERH/RH") at his own request.  (Doc. 13-1 at 3).  Under prison policy, an inmate cannot remain in ERH for more than six months.  (*Id.*).  If no behavioral issues arise following a six-month stay in RH/ERC, ODRC policy requires that the inmate's security level be reduced to Level 4 and that the inmate be transferred to the general population.  (*Id.* at 4).  Fort's security level was subsequently reduced in accordance with this policy.  (*Id.*).  While Fort initially resisted returning to the general population, he ultimately left restrictive housing voluntarily.  (*Id.*).

The broader issue is whether denying Fort access to his preferred cognitive behavioral therapy – namely, his novel and songs – constitutes cruel and unusual punishment under the Eighth Amendment.

### 1.  Failure to provide adequate medical treatment

The Eighth Amendment protects inmates from punishment that is "barbarous," "involve[s] the unnecessary and wanton infliction of pain," or contravenes "evolving standards of decency."

*Rhodes v. Chapman* 452 U.S. 337, 345-46 (1981).  Prison officials are required to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).  But inmates are not entitled to freedom from the discomforts and inconveniences of incarceration.  *See Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (citing *Rhodes*, 452 U.S. at 346).  "Only deliberate indifference to serious medical needs or extreme deprivations regarding the conditions of confinement will implicate the protections of the Eighth Amendment."  *Hall v. Brazie*, No. 4:22-cv-02275, 2023 WL 2633531, at *3 (N.D. Ohio Mar. 24, 2023) (citing *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)).

Deliberate indifference contains both an objective and subjective component.  *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011) (citation omitted).  The objective component requires an inmate to establish that he faced a "sufficiently serious" medical need.  *Est. of Downard v. Martin*, 968 F.3d 594, 600 (6th Cir. 2020) (citing *Farmer*, 511 U.S. at 834).  A serious medical need is one that has been diagnosed by a doctor and requires treatment, or one that is "so obvious that even a layperson would easily recognize the need for medical treatment."  *Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (citation omitted).

If the inmate establishes a sufficiently serious medical need, he must then satisfy the subjective prong by demonstrating the defendant acted with a sufficiently culpable state of mind in denying medical treatment.  *Id.*  (citation and internal quotation marks omitted).  The prison official must have "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  A prison official's intentional denial or delay of access to medical care, or intentional interference with a prescribed treatment can constitute deliberate indifference.  *Estelle v. Gamble,* 429 U.S. 97, 104-05 (1976).

7

The record contains substantial evidence demonstrating the seriousness of Fort's mental condition.  Weirich acknowledges that Fort's behavior appeared "off," and describes his allegations as "delusional," "all over the place," and as not making "much sense."  (Doc. No. 13-1 at 3).  Buck similarly states that Fort's kites frequently did not make sense and "contained irrational and unorganized thoughts."  (*Id.* at 6).  These thoughts and allegations included claims involving covert prison operations, economic espionage within the institution, and assertions connecting his fictional writings to global events such as the Covid-19 pandemic.

Fort had an extensive disciplinary history, (*id.* at 292-94), lashed out aggressively towards prison guards, (*id.* at 4), complained of anxiety, (*id.* at 46), and exhibited inappropriate sexual behavior towards female staff.  (*Id.* at 6-7).  Viewing the record in a light most favorable to Fort, a reasonable jury could conclude that Fort exhibited obvious symptoms of mental illness that qualify as a "sufficiently serious" medical need.  *See Bays v. Montmorency Cnty.*, 874 F.3d 264, 268 (6th Cir. 2017) (holding mental illness was objectively serious were inmate repeatedly demonstrated psychological symptoms that included paranoia, troubling thoughts, anxiety, anger, and violent impulses).

"[W]hen prison officials fail to provide treatment for an inmate's serious medical condition, the inmate has endured an objectively serious deprivation."  *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citations omitted).  The record indicates that Fort received some treatment for his condition, but desires different treatment – cognitive behavioral therapy.  "But a desire for additional or different treatment does not by itself suffice to support an Eighth Amendment claim." *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017) (citations omitted).  Where prison officials have rendered medical treatment, an Eighth Amendment violation occurs "only if the treatment is 'so cursory as to amount to a conscious disregard for [the inmate's] needs.'"  *Bays*, 874 F.3d at 269 (quoting *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 448 (6th Cir. 2014)) (alternation by *Bays*).  The

8

inmate must show that the medical care the inmate received was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

The record does not support the allegation that the treatment Fort received was "grossly incompetent." Fort was seen and evaluated by the Mental Health Department, was assigned to the Mental Health case load, and had weekly access to mental health providers and therapeutic supplies. And Fort acknowledged he was prescribed medication. The record does not contain expert testimony supporting the medical necessity for cognitive behavioral therapy, offer medical evidence to establish the detrimental effects of allegedly inadequate treatment, or indicate that Fort suffered injuries because of a delay in receiving cognitive behavioral therapy. *Cf. Rhinehart*, 894 F.3d at 737-38.

Further, the record is devoid of evidence that Weirich or Buck consciously disregarded a substantial risk of serious harm concerning Fort's mental illness. When Weirich grew concerned over Fort's mental health, she acted promptly on his behalf by contacting the Mental Health Department, who then added Fort to the mental health case load. While interference with a prescribed medical treatment can constitute deliberate indifference, the record does not indicate that Fort was ever prescribed cognitive behavioral therapy.

Fort may be unsatisfied with the treatment he has received and desire cognitive behavioral therapy in the form of access to his novels and songs. But "differences in judgement between an inmate and prison medical personnel regarding the appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim." *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir 1976)).

Moreover, nothing in the record suggests that Fort cannot now continue to engage in his preferred cognitive behavioral therapy by writing new novels and songs.

Thus, Fort's Eighth Amendment claim based on denial or interference with cognitive behavioral therapy fails as a matter of law.  *See Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 359 (6th Cir. 2013) (finding prison officials did not act with deliberate indifference when they addressed inmate's complaints, referred inmate for a mental health assessment, conducted an evaluation, and provided treatment).

### 2.  Failure to guarantee safety by denying protective control

The Defendants argue that Fort cannot establish that Weirich acted with deliberate indifference in denying his request for PC, because denying the PC request was reasonable.  (Doc. No. 13 at 16).  They also argue that Fort's allegations lack sufficient context to support his claims.  (*Id.* at 2-3).

Fort alleges the Defendants possessed a "'sufficiently culpable state of mind" and notes that Weirich served on the Protective Control Committee that denied his PC request.  (Doc. No. 1 at 3). He cites ODRC Policy 53-CLS-11, which requires prison staff to remain alert to signs that an inmate is in danger and may require protection.  (*Id.* at 4).  Fort claims that he was subjected to a "campaign of harassment" by ODRC, necessitating protective control.  (*Id.* at 6).  He further alleges that Weirich knew that his delusional beliefs led to paranoia, which increased the need for protective custody.  (*Id.* at 9-10).

The record, however, does not support a finding that Weirich acted with deliberate indifference by consciously disregarding a substantial risk of serious harm.  The record reveals that Fort's PC request was based on his belief that his victims were attempting to harm him while he was incarcerated.  (Doc. No. 13-1 at 287).  While Weirich felt Fort's allegations were far-fetched, the record demonstrates she, nevertheless, conducted a prompt and thorough investigation,

communicated her findings to Fort, and explained the basis for the committee's decision.  (*Id.* at 3-4).  In sum, the record shows that Weirich and the committee members were receptive to Fort's concerns, evaluated the information available, and exercised professional judgment in determining that PC was unwarranted.  While Fort expressed dissatisfaction with the committee's decision, the record does not support a finding that Weirich acted with deliberate indifference in denying his request.  *See Conley v. Wardern*, No. 1:07cv737, 2008 WL 4657084, at *5 (S.D. Ohio Oct. 21, 2008) (finding no deliberate indifference to inmate's safety where prison officials heard inmate's complaints, investigated those complaints, and yet denied protective control).

Federal courts have also long recognized that matters of internal prison security are ordinarily entrusted to the discretion of prison administrators.  *Rhodes*, 452 U.S. at 349 n.14.  Absent evidence that officials ignored a known risk, disregarded an inmate's request for PC, or failed to respond reasonably, courts generally will not substitute their judgment for that of prison officials.  *See Conley*, 2008 WL 4657084, at *5 (noting that a court should not "'freely substitute [its] judgement for that of officials who have made a considered choice.'") (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)) (alternation by *Conley*).

Even when viewing the evidence in the light most favorable to Fort, a reasonable jury could not conclude Weirich acted with deliberate indifference to a substantial risk of serious harm in denying Fort's PC request.  Accordingly, the Defendants are entitled to judgment as a matter of law on Fort's Eighth Amendment claims.

## B.    FIRST AMENDMENT VIOLATIONS

Fort brings two First Amendment claims: one based on retaliation and the other on denial of access to courts.  (Doc. No. 1 at 5-8).  Fort alleges that in response to settling his prior lawsuit against Weirich, he has been subjected to a "campaign of harassment" at the hands of the ODRC, which included the search of his cell and the confiscation of his novel and songs.  (*Id.* at 5).

Defendants argue Fort has failed to establish the elements necessary to support either claim.  (Doc. No. 13 at 11-12).

As a preliminary matter, in order to hold an individual defendant liable under § 1983, a plaintiff "must plead that each Government-official defendant, through his own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  The record does not contain any facts connecting Weirich or Buck with the initial extraction and search of Fort's cell, or the confiscation of his novel and songs.  At the time of the SRT search, Fort was no longer in Weirich's unit.  (Doc. No. 13-1 at 4).

Moreover, there is nothing in the record to indicate Weirich and Buck were aware beforehand that the SRT was going to search Fort's cell and confiscate his property.  Nor does the record show that Weirich and Buck acted in a supervisory role over the SRT agents and "'implicitly authorized, approved, or knowingly acquiesced'" to the agents' alleged unconstitutional conduct.  *See Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (quoting *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)) (holding that to establish a § 1983 "failure to supervise" claim, plaintiff must show supervisor "implicitly authorized, approved, or knowingly acquiesced" to the unconstitutional conduct of subordinates).  Thus, Fort cannot hold Weirich and Buck liable for the initial search of his cell and confiscation of his property.

That said, even if I were to assume that Fort could connect Weirich and Buck's individual actions to the alleged First Amendment violations, his claims would nevertheless fail.

### 1. Retaliation

To prevail on a First Amendment retaliation claim, an inmate must establish that "(1) he engaged in protected conduct; (2) the defendant took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage that conduct;' and (3) 'the adverse action was motivated at least in part by the [prisoner's] protected conduct.'"  *Hill v. Lappin*, 630 F.3d 468,

472 (6th Cir. 2010) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999)) (alteration by *Hill*).

Defendants argue that Fort has failed to establish the first element of a retaliation claim because his grievances and lawsuits were frivolous and therefore not protected by the First Amendment. (Doc. No. 13 at 11). I find this argument unpersuasive.

The Sixth Circuit has held that an inmate cannot maintain a retaliation claim following his pursuit of a cause of action that was ultimately dismissed as frivolous. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Thus, Fort's allegations of retaliation for the pursuit of his prior lawsuit against Weirich "is protected conduct only to the extent that the underlying claims had merit." *Id.* While Fort's prior lawsuit against Weirich was voluntarily dismissed before Weirich moved for summary judgment or the case went to trial, my colleague, Judge James R. Knepp, did not rule that the underlying claims were without merit. Judge Knepp denied Weirich's Rule 12(b)(6) motion to dismiss for failure to state a claim and the parties came to a mutually acceptable resolution. (*See* 3:23-cv-0136, Doc. Nos. 12, 19, 20, and 22).

While the sufficiency of Fort's prior claim was not fully tested by summary judgment or trial, the record in that case does not support a conclusion that Fort's allegations were frivolous or without merit. Thus, viewing the facts in the light most favorable to Fort, I conclude that a reasonable jury could find that when Fort filed and subsequently agreed to dismiss his prior case against Weirich, he was engaged in conduct protected by the First Amendment.

Next, Defendants argue that the alleged adverse actions were *de minimis* and would not deter an ordinary person from engaging in protected First Amendment activities. (Doc. No. 13 at 11-12). They support this argument by noting that the alleged retaliation did not deter Fort from continuing to file grievances and lawsuits. (*Id.* at 12).

But the fact that Fort was not actually deterred from filing subsequent grievances and lawsuits is not dispositive. The adverseness standard is objective and does not turn on a plaintiff's subjective response. *Bell v. Johnson*, 308 F.3d 594, 606 (6th Cir. 2002) (citation omitted). "The relevant question is whether the defendant's actions are '*capable* of deterring a person of ordinary firmness'; there is no requirement that the plaintiff show actual deterrence." *Id.* (quoting *Thaddeaus-X*, 175 F.3d at 398) (emphasis added by *Bell*).

Whether a particular action is "sufficiently adverse" is a factual determination. *Bell,* 308 F.3d at 603. "[U]nless the claimed retaliatory action is truly 'inconsequential,' the plaintiff's claim should go to the jury." *Id.* (citing *Thaddeaus-X*, 175 F.3d at 398). The Sixth Circuit has held that the confiscation of legal papers and other property, potential loss of privileges, and the retaliatory searches of cells are sufficiently adverse to support a retaliation claim. *See, e.g., Maben v. Thelen*, 887 F.3d 252, 266-67 (6th Cir. 2018) (finding loss of privileges is not "inconsequential"); *Bell*, 308 F.3d at 604-05 (subjecting prisoner to retaliatory cell searches and confiscating legal papers and property are adverse actions); *LaFountain v. Harry*, 716 F.3d 9 44, 949 (6th Cir. 2013) (taking possession of inmate's typewriter was a sufficiently adverse action).

Here, Fort alleges that he was forcibly removed from his cell by the SRT, subjected to a search, and deprived of a good deal of his personal writings – all in response to protected First Amendment activity. Viewed in the light most favorable to Fort, a reasonable jury could conclude that this conduct is sufficient to satisfy the "adverse action" prong of a First Amendment retaliation claim.

Thus, I turn to the third element – whether the record establishes a causal connection between Fort's protected conduct and the alleged adverse actions. The only evidence in the record supporting Fort's allegations is the three-month temporal proximity between the agreement to resolve his prior litigation with Weirich and the SRT's search of his cell and confiscation of his

14

property.  But the Sixth Circuit has been very reluctant to conclude that evidence of temporal proximity alone can establish retaliatory motive.  *Hill*, 630 F.3d at 476 (citing *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010)).  And Fort has not presented any additional evidence from which a reasonable jury could find that the SRT's conduct, or any other action taken by Weirich or Buck, was in service of a retaliatory motive.  Thus, the Defendants are entitled to summary judgment on Fort's retaliation claim.

### 2.  Access to the courts

Fort's remaining First Amendment claim – denial of "access to the courts" – fares no better. (Doc. No. 1 at 6).  Inmates possess a constitutional right of access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 821 (1977) (overruled in part on other grounds).  This right gives rise to derivative protections, including the safeguarding of an inmate's "legal mail," *see Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003), and the requirement that prison officials assist in the "preparation and filing of meaningful legal papers."  *Bounds,* 430 U.S. at 828.  The central issue of whether a communication is legal mail or legal materials is if it "'implicate[s] the right to petition for grievances and the right of access to the courts.'"  *Am. C.L. Union Fund of Mich. v. Livingston Cnty.*, 796 F.3d 636, 643 (6th Cir. 2015) (quoting *Jones v. Caruso*, 569 F.3d 258, 268 (6th Cir. 2009)) (alteration by *Am. C.L. Union Fund of Mich.*).  The right of access to the courts is not unlimited and "extends to direct appeals, habeas corpus applications, and civil rights claims only."  *Thaddeaus-X*, 175 F.3d at 391.  To prevail on an "access to the courts" claim, a prisoner must demonstrate an actual injury by showing that a prison official's conduct thwarted the pursuit of a nonfrivolous claim.  *See Lewis v. Casey*, 518 U.S. 343, 349 (1996); *see also Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019).

Fort refers to his novel interchangeably as "legal material," "legal mail," or "legal work." (Doc. No. 1 at 5).  He alleges that the confiscation of his novel prevented him from including it in a clemency application and thereby violated his right of access to the courts.  (*Id.* at 6).  An application

for executive clemency, however, does not relate to a direct appeal, habeas corpus application, or a civil rights claim.  Accordingly, the application – and documents submitted in support of such an application – do not qualify as "legal mail" or "legal materials."

Nor has Fort demonstrated actual injury.  He does not explain why he cannot submit a clemency application without attaching his 800-page novel or show how the confiscation prejudiced any pending or contemplated direct appeal, habeas corpus application, or nonfrivolous civil rights claim.  *See Clark v. Corrs. Corp. of Am.*, 113 F. App'x 65, 67-68 (6th Cir. 2004) (finding First Amendment claim failed because, although legal materials went missing, prisoner did not allege interference with a non-frivolous claim challenging his conviction).  Thus, Fort has failed to show a genuine dispute of material fact and Defendants are entitled to judgment as a matter of law on Fort's First Amendment "access to the courts" claim.

C.     **FOURTH & FOURTEENTH AMENDMENT VIOLATION**

Defendants argue that Fort cannot prevail on a Fourth Amendment claim because inmates possess no right to privacy in their prison cells.  (Doc. No. 13 at 17-18).  Defendants also allege that Fort's Fourteenth Amendment claim fails because adequate state tort and common-law remedies can address the alleged loss of his novel.  (*Id.* at 18-19).  Fort claims that the search of this cell and confiscation of his novel was part of a "campaign of harassment" perpetrated by the ODRC.  (Doc. No.1 at 6).  He also argues that his novel and songs are property, and their seizure violated his due process rights.[1]  (*Id.* at 8).

---

[1] Although Fort does not expressly allege a violation of his substantive due process rights, such a claim would fail.  "'Prisoners do not have a fundamental right to personal property under the Constitution.'"  *Taylor v. Champers-Smith*, No. 2:23-cv-2956, 2025 WL 2451151, at *5 (S.D. Ohio Aug. 26, 2025) (quoting *Johnson v. Miron*, No. 2:11-cv-6, 2011 WL 489778, at *4 (W.D. Mich. Feb. 7, 2011)) (dismissing Equal Protection claim).  Further, inmates do not have a protected interest or fundamental right to keep property in their cells.  *Id.*

I reiterate that Fort must show that Weirich and Buck personally violated his constitutional rights to hold them individually liable under § 1983. *Iqbal*, 556 U.S. at 676. Because the record does not show that Weirich or Buck participated in the search or seizure in any manner, they cannot be held liable for a violation of the Fourth Amendment.

Even if Fort could connect Weirich and Buck to the alleged constitutional violations, his claims would still fail. The Fourth Amendment, as incorporated against the states through the Fourteenth Amendment, protects against unreasonable searches and seizures. U.S. Const. amend. IV. *See also Wolf v. Colorado*, 338 U.S. 25, 27-28 (1949) (overruled in part on different grounds). But "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Hudson*, 468 U.S. at 526. Because inmates have no legitimate expectation of privacy in their cells, searches, even if conducted with the intent to harass, cannot be deemed "unreasonable" under the Fourth Amendment. *Id.* at 529-30. Thus, even if Buck or Weirich instructed the SRT to search Fort's cell in retaliation, that search did not violate the Fourth Amendment.

Fort also cannot prevail under the Fourteenth Amendment. The Fourteenth Amendment prohibits the state from "depriv[ing] any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In *Hudson*, the Supreme Court held that the unauthorized, intentional destruction of property by a state employee does not violate procedural due process where the state provides a meaningful post-deprivation remedy. 468 U.S. at 533. Courts within our circuit have repeatedly recognized that the Ohio Court of Claims offers a meaningful post-deprivation remedy for inmates alleging loss or destruction of their property. *See Meyers v. Blackwell*, No. 2:12-CV-255, 2012 WL 6552842, at *2 (S.D. Ohio Dec. 13, 2012), *report and recommendation adopted by* 2013 WL 312689 (S.D. Ohio Jan. 25, 2013); *Clark v. Johnston*, No. 4:07 CV 941, 2007 WL

2050942, at *3 (N.D. Ohio Jul. 12, 2007); *Pointer v. Chambers-Smith*, No. 2:24-cv-1807, 2024 WL 4929292, at *1-2 (S.D. Ohio Dec. 2, 2024).

Similarly, in *Daniels v. Williams*, the Supreme Court held that the Due Process Clause is not implicated by the negligent acts of prison officials resulting in unintended loss or injury. 474 U.S. 327, 328 (1986). Accordingly, whether Fort's property was negligently misplaced or intentionally destroyed, the Fourteenth Amendment is not implicated. Thus, Fort has failed to establish a genuine dispute of material fact with respect to his Fourth and Fourteenth Amendment claims and Defendants are entitled to judgment as a matter of law.

**D.      QUALIFIED IMMUNITY**

Defendants also assert that they are entitled to qualified immunity on all claims. Qualified immunity shields government officials performing discretionary functions from civil liability unless their conduct violates a constitutional right that was clearly established at the time of the alleged misconduct. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Courts may determine whether a constitutional violation occurred and whether the right was clearly established in whichever order is appropriate for the specific case. *Pearson v. Callahan*, 555 U.S. 223, 236 (2003).

Because Fort has failed to establish the Defendants violated his constitutional rights, Weirich and Buck are entitled to qualified immunity, and I need not address whether the law clearly established Fort's alleged constitutional violations. *See Dist. of Columbia v. Wesby*, 583 U.S. 48, 62 (2018).

## V. CONCLUSION

For the reasons stated above, I grant Defendants' motion for summary judgement on all claims, (Doc. No. 13), and deny as moot Fort's request for a preliminary injunction and temporary restraining order. (*See* Doc. No. 1). I certify, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this decision could not be taken in good faith. This case is closed.


So Ordered.



s/ Jeffrey J. Helmick
United States District Judge